EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PEDRO NEGRÓN COLÓN, acusado y apelante.

Núm. 7780.—*Sometido:* Julio 10, 1939. *Resuelto:* Julio 14, 1939.

*H. Miranda* y *R. Rafols Estrada,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Pedro Negrón Colón fué acusado de asesinato en segundo grado y declarado culpable de homicidio voluntario. Contra la sentencia de tres años y nueve meses que se le impuso, apeló para ante este tribunal. De la prueba del fiscal resulta que el acusado era policía insular y prestaba servicios en el barrio Quebrada, de Camuy, donde ocurrió el crimen. La noche del dos de enero del año pasado se celebraba un baile en la casa de Juan González, en el indicado barrio. Entre los presentes se hallaba el acusado. El interfecto, Fidel Hernández, era dueño de un cuatro, que prestó a uno de los músicos con la condición de que se lo devolvieran a medianoche. El baile se celebró en perfecto orden. El acusado se hallaba sentado en el comedor, y el interfecto, que parece llegó alrededor de las once de la noche, se encontraba recos-

tado de la baranda del balcón, hablando con otras personas. Alrededor de las once y media o doce de la noche, el músico que tocaba el cuatro lo tenía sobre su falda mientras comía unos dulces que le habían servido y el interfecto tomó el cuatro y se marchó. Poco después de haber salido, varias personas se enteraron que se habían llevado el cuatro y bajaron de la casa en busca de Fidel para quitárselo, pero como ya iba algo lejos, tres de los que participaban del baile y el policía acusado tomaron una guagua que había allí y salieron en su busca. Cuando sólo habían marchado como unos 500 metros le dieron alcance. La guagua continuó su marcha como veinte metros más después de dar alcance al interfecto y entonces se detuvo a esperarlo, pues caminaba a pie y llevaba el cuatro debajo del brazo. Los acompañantes del policía bajaron de la guagua para dirigirse al interfecto pero el policía les dijo que lo dejasen a él con el interfecto y que él le quitaría el cuatro. Al pasar el interfecto, el acusado le pidió el cuatro, pero aquél no hizo caso y siguió su camino. Después de pedirle el instrumento una o dos veces más, el interfecto se detuvo y según uno de los testigos del fiscal hizo un cierto movimiento que el testigo denominó "aguaje", consistente en mover los brazos. Entonces el acusado le propinó un macanazo que lo derribó. Una vez en el suelo el acusado, le registró los bolsillos y uno de los testigos de cargo declaró que le vió sacarle algo pero que no sabe lo que fué. Después de registrarle los bolsillos, el interfecto se incorporó y levantándose se dirigió al acusado pidiéndole que le devolviese lo que le había cogido. Se negaba el acusado, insistía el interfecto, acercándosele, mientras el acusado retrocedía para apartarse del interfecto, hasta que finalmente le propinó dos macanazos más. Luego lo obligó a montar en la güagua para llevarlo al hospital de Arecibo. Mientras iba en la guagua volvió a darle otro macanazo. Era tal el estado en que se hallaba el interfecto que tuvieron que llevarlo a la clínica en una camilla, porque

no podía sostenerse sobre sus pies. En la clínica una *nurse* lo curó. No obstante presentar el interfecto seis distintas fracturas en el cráneo, como se comprobó luego por la autopsia, y advertirle la *nurse* que su estado era de gravedad y que debía dejarlo en la clínica, insistió el acusado en llevarlo a la cárcel, y entre dos y tres de la mañana llegó con el a la Cárcel Municipal de Camuy. El preso que en aquellos momentos se hallaba al cuidado del depósito municipal, nos describe la llegada del acusado en la siguiente forma:

"P. ¿En la noche del dos al tres de enero de 1938 llegó por allí algún preso, alguna persona arrestada?

"R. El único que llegó allí fué el señor ese que golpeó el guardia. El único.

"P. Cuénteme eso.

"R. Resulta que yo estaba fuera haciéndole servicios a los presos de agua.

"P. ¿Fuera?

"R. Dentro. Y yo dormía en una hamaca fuera. Como a las dos o tres de la mañana sentí que me tocaron la puerta y dije: 'Un momento,' y me puse la ropa y zapatos y abrí la puerta y como tiene un rastrillo que es donde tienen ruedas aparte, en lo que me dilaté, ya el guardia había metido unos macetazos al restrillo y lo había abierto y ví el señor que se murió.

"P. ¿Dónde estaba?

"R. Abajo, acostado en el suelo.

"P. Siga.

"R. Entonces llegó el guardia y me dijo: 'Coja ese hombre', y lo arrastré a un calabozo y lo acosté en un camastro. Estuvo allí como hasta las cinco y media de la mañana en que llegaron sus familiares.

"P. ¿Durmió en un camastro?

"R. Sí, señor." (T. de E., pág. 49.)

\* \* \* \* \* \* \*

"P. ¿A qué hora llegó el policía con él?

"R. De dos y media a tres de la mañana.

"P. ¿En algún momento recobró el sentido?

"R. No, señor.

"P. ¿Hablaba?

"R. No, señor.

"P. ¿Se sentaba, se paraba?

"R. No, señor.

"P. ¿Abría los ojos?

"R. No, señor.

"A preguntas del abogado Sr. Miranda, declaró:

"P. Dígame, usted recuerda si con el policía fué un tal Rufino Pérez acompañándolo?

"R. Llegó uno solo con él.

"P. ¿Recuerda si es verdad que el policía le dijo a usted que le buscaran algo, una manta, para que se la pusieran debajo?

"R. Me dijo que lo acostaran. Le recosté la cabeza sobre unos libros." (T. de E., pág. 50.)

El acusado trató de probar que al dar muerte al interfecto lo hizo en defensa propia. Su prueba consistió en su declaración, la del Jefe de Distrito de la Policía Insular en Camuy, la del Jefe de Distrito de Arecibo, las armas que dijo haber ocupado al interfecto y la declaración del padre de este último, que fué llamado por el Jefe de la Policía de Camuy para investigar sobre la procedencia de las armas presentadas por el acusado. El siguiente pasaje de la declaración del acusado nos presenta la descripción que él hace de lo sucedido con el interfecto al producirle los golpes que le causaron la muerte:

"P. ¿Lo había visto realizar algún delito público en el baile?

"R. Nunca.

"P. ¿Le vió a él alguna arma visible en su cuerpo?

"R. No, señor.

"P. ¿Iba tranquilamente?

"R. Sí, señor.

"P. ¿Con qué autoridad le pidió el cuatro?

"R. En investigar el asunto del cuatro.

"P. ¿Necesitaba que le diera el cuatro?

"R. Yo le pedía el cuatro, 'Fidel, deme el cuatro, tenga la bondad', y cuando cambió se me tiró encima y no dió lugar.

"P. ¿Se le tiró para encima, y tenía algo en la mano?

"R. El cuatro.

"P. ¿Le tiró?

"R. Sí, señor.

"P. ¿Tenía el cuatro en qué mano?

"R. El llevaba el cuatro aquí y lo cambió aquí debajo.

"P. ¿No acaba de decir que le tiró con el cuatro?

"R. Lo metió aquí y cuando hizo el aguaje tiró el cuatro y pasó por encima de mí.

"P. ¿Le tiró?

"R. Hizo el aguaje.

"P. ¿No dice que le pasó?

"R. Después, que me pasó el cuatro.

"P. ¿Cómo podía este señor cambiarse el cuatro, tirárselo y meterse la mano?

"R. No es así.  Trató de sacar un arma del bolsillo.

"P. ¿La vió el arma?

"R. No, señor.

"P. ¿Por qué lo sabe?

"R. Hizo el aguaje.

"P. ¿Con qué mano?

"R. Con la derecha.

"P. ¿Con qué mano le tiró con el cuatro?

"R. Entonces haló el cuatro y tiró.

"P. ¿Entonces le dió el macanazo?

"R. Sí, señor.

"P. ¿Cuando se tiró de la guagua aquellas personas iban a atacarlo, les dijo que se estuvieran quietos, entonces usted lo llamó, 'Fidel, párate ahí; Fidel, dame el cuatro.'  Entonces el cuatro se lo metió debajo, aquí, y fué a sacar un arma y le tiró con el cuatro. ¿Esa es la verdad?

"R. Sí, señor.

"P. ¿Al bolsillo de atrás?

"R. Hizo aguaje de sacar un arma.

"P. Cogió el cuatro y tiró?

"R. Yo lo ví de momento, cuando hizo el aguaje así y ahí mismo él me tiró.

"P. ¿Con el cuatro, agarrando el cuatro con la mano derecha?

"R. Sí, señor.

"P. ¿Las armas las tenía encima?

"R. De momento, la mano fué tan rápida, no sé si las llevaba en la mano.

"P. ¿Le tiró el cuatro con la mano derecha?

"R. Le dí entonces el macanazo.

"P. Cuando le dió el macanazo ¿cayó al suelo?

"R. Sí, señor.

"P. ¿Entonces lo registró?

"R. Sí, señor.

"P. ¿Y le sacó . . .?

"R. Una manopla y una cuchilla.

"P. ¿En el mismo bolsillo de atrás?

"R. Sí, señor, derecho.

"P. ¿Las cogió y se las metió en el bolsillo?

"R. Al poquito rato.

"P. ¿En ese momento se las enseñó?

"R. No, estaba luchando.

"P. Cuando lo registró, ¿estaba en el suelo?

"R. Sí, señor, pero él se levantó en seguida. Le metí la mano y se las saqué.

"P. ¿El cuatro estaba tirado por allí?

"R. Y él voló y se me vino encima tratando de agarrarme.

"P. ¿Con el rotén en la mano?

"R. Sí, señor.

"P. ¿Ya usted sabía que no tenía armas?

"R. Se las había quitado.

"P. ¿El no tenía el cuatro y entonces usted le dió otro macanazo?

"R. El hombre insistía siempre, no podía competir a la fuerza con él.

"P. Entonces, ¿era más fuerte?

"R. Sí, señor.

"P. ¿Ese segundo macanazo se lo dió sabiendo que no tenía armas, porque se las había quitado?

"R. No muy fuerte.

"P. ¿Blandito?

"R. Sí, señor."   (T. de E., 61–64.)

Negó el acusado que la *nurse* le hubiese dicho que el estado del interfecto fuera de gravedad y aceptó que el interfecto no estaba ebrio ni olía a licor.

El Jefe de la Policía de Camuy se limitó a declarar que el 3 de enero, fecha en que falleció el interfecto, el acusado le presentó una cuchilla cuya hoja medía cuatro pulgadas y una manopla, informándole que dichas armas habían sido ocupadas por él al acusado. Que el Jefe llamó al padre de este último al cuartel y le mostró las armas, y que dicho

señor negó que la manopla fuera de su hijo, pero aceptó que la cuchilla sí lo era. El Jefe de la Policía de Arecibo declaró sobre la buena conducta que había observado el acusado mientras trabajó a sus órdenes, y el padre del interfecto, que fué llamado por la defensa, negó enfáticamente haber dicho al Jefe de la Policía que aquellas armas fuesen de su hijo y que por el contrario él manifestó que no eran de él, porque su hijo en ningún momento portó armas.

El alegato del acusado es sumamente breve, pues sólo consiste de tres páginas a maquinilla. Imputa a la corte sentenciadora dos errores al negarse a transmitir dos instrucciones especiales propuestas por la defensa, a saber:

"1. La Corte erró al negar la siguiente instrucción:

" 'Admitiendo que el policía al hacer el arresto del hoy interfecto no tenía orden de ningún magistrado, y que se trataba de un *misdemeanor,* en otras palabras, que el arresto fuese ilegal, el hoy interfecto no tenía derecho a agredir al acusado, y al hacerlo el policía acusado cumplía con su deber al repeler la agresión por los medios más efectivos que tuviera a su alcance en aquellos momentos, considerando las circunstancias que motivaron que el acusado tuviera que hacer uso de su rotén para defenderse de la agresión del interfecto. *Pueblo* v. *Rodríguez,* 48 D.P.R. 395.'

"2. También erró la Corte al denegar la siguiente instrucción:

" 'Comparecen en este caso los abogados que suscriben y respetuosamente solicitan de esta Hon. Corte que transmita al jurado la siguiente instrucción:

" 'Si los señores del jurado tienen duda en cuanto a si el acusado actuó o no en legítima defensa, deben darle el beneficio de esa duda y absolverlo libremente.' "

Al calce de las instrucciones denegadas la corte expresó que las denegaba por estar cubiertas por las instrucciones generales. La defensa no discute los errores planteados, limitándose a alegar que al negarse la corte a transmitirlas, actuó con prejuicio y manifiesto error.

La corte sentenciadora instruyó ampliamente sobre la defensa propia. La instrucción especial a que se refiere

el primer señalamiento de error está sustancialmente cubierta por las siguientes, transmitidas por la corte:

"Si ustedes creen que es verdad que ese interfecto prestó ese cuatro hasta las doce de la noche y que a esa hora fué al baile o antes de esa hora fué al baile y cogió el cuatro de su propiedad y se fué con él, ninguna persona, ningún policía, podía requerirlo legalmente para que entregara ese instrumento, y si la persona que llevaba el cuatro de su propiedad se resistiera entregarlo en cualquier forma que no fuera yendo más allá de lo necesario para defender su propiedad, estaba justificado, aun cuando un policía debe merecer el mayor respeto, porque los policías son agentes del orden.

"Un policía debe siempre pensar cuando realice un acto, si él está actuando dentro de ley, porque si el policía se sale del margen de la ley e invade el derecho ciudadano, entonces las consecuencias no pueden atribuirse únicamente a la culpa del ciudadano, si se ha iniciado por la propia autoridad un acto que está fuera de la ley.

"También debo instruiros que un policía puede estar justificado cuando se ve obligado a matar venciendo resistencia en funciones legítimas o cuando procura legalmente mantener el orden; esto se llama homicidio justificado. Puede también usar de su macana cuando cualquier ciudadano ejerce alguna violencia contra él, sin motivo legal, pero en el uso de la macana, como de cualquier instrumento que pueda causar daño corporal o la muerte, los funcionarios públicos deben tener sumo cuidado. Deben ejercer aquella violencia que sea necesaria para dominar a la persona rebelde, para obligarla al cumplimiento de su deber, o para tranquilizarla, pero un policía nunca puede estar justificado en ir más allá de la autoridad que la ley le confiere, porque si bien la policía es una institución hermosa y brillante, en un pueblo civilizado, es también o puede ser también, en caso de abuso, una institución que provoque el odio del pueblo, y cuando el pueblo le falta el respeto a la policía o a los tribunales, entonces, señores del jurado, la revolución social está muy cerca." (T. de E., pág. 80.)

"La Corte da la siguiente instrucción:

" 'El derecho de una persona para resistir un arresto ilegal no es ilimitado. Aunque si bien una persona a quien se intenta arrestar puede usar fuerza proporcionada para resistir el arresto, sin embargo, si los medios que usa son desproporcionados, tal resistencia resulta ilegal.' " (T. de E., pág. 86.)

También instruyó la corte ampliamente sobre duda razonable. Aunque específicamente no instruyó a los señores del jurado que si abrigaban duda de que el acusado al matar al interfecto lo había hecho en defensa propia, debían absolverlo, sin embargo, del contexto de todas las instrucciones en relación con la duda razonable fácilmente se infiere que si bien hubiera sido mejor transmitir la instrucción especial solicitada, sin embargo, ningún perjuicio pudo causarse al acusado al denegarla.

En el caso de *El Pueblo* v. *Cartagena*, 54 D.P.R. 870, dijimos:

"La corrección o suficiencia de las instrucciones al jurado no se resuelve considerando y analizando determinada instrucción aisladamente de las demás, sino considerándolas como un todo, pues lo que se dice en una puede explicar, aclarar o rectificar lo que incorrectamente se haya dicho u omitido en otra."

La instrucción denegada, motivo del segundo señalamiento de error, virtualmente se halla comprendida en la siguiente, que fué transmitida por la corte:

"Si los Señores del Jurado entienden, después de apreciar toda la prueba en conjunto, que Pedro Negrón dió muerte justificada; o en legítima defensa propia en la forma como la Corte ha explicado, o si los Señores del Jurado entienden que el fiscal no ha probado su caso, o si los Señores del Jurado tienen duda razonable de si el acusado es culpable, en cualquiera de esos casos, debéis traer un veredicto de no culpable." (T. de E., pág. 84.)

A nuestro juicio no se han cometido los errores señalados ni ningún otro que lesione los derechos sustanciales del acusado.

*Procede, por consiguiente, desestimar el recurso y confirmar la sentencia apelada.*

El Juez Asociado Señor Travieso no intervino.